# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs February 1, 2011

## WILLIAM WILSON v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**Nos. 00-05479-80      W. Otis Higgs, Jr., Judge**

---

### No. W2010-01846-CCA-R3-PC  - Filed May 20, 2011

---

The petitioner, William Wilson, appeals the denial of his petition for post-conviction relief, arguing that his trial counsel provided ineffective assistance by failing to adequately advise him of the consequences of not testifying at trial.  Following our review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which JERRY L. SMITH and NORMA MCGEE OGLE, JJ., joined.

Lance R. Chism (on appeal) and Matthew Ian John (at hearing), Memphis, Tennessee, for the appellant, William Wilson.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; William L. Gibbons, District Attorney General; and Summer Morgan, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

In May 2001, following a joint trial with his half-brother, Chico McCracken, the petitioner was convicted by a Shelby County jury of aggravated robbery and first degree felony murder and was sentenced by the trial court to an effective sentence of life plus eight years in the Department of Correction.  His convictions and sentences were affirmed by this court on direct appeal, and our supreme court denied his application for permission to appeal. State v. William Wilson, No. W2001-02601-CCA-R3-CD, 2003 WL 22446262, at *1 (Tenn. Crim. App. Oct. 22, 2003), perm. to appeal denied (Tenn. Mar. 22, 2004).

The petitioner's convictions stemmed from his participation with McCracken in an armed robbery and ensuing high-speed flight from police that resulted in a crash that claimed the life of one of the pursuing officers. Id. at *1-2. Our direct appeal opinion reveals that the robbery took place outside a strip club. Id. at *1. The petitioner was inside the club while McCracken played dice outside with a group of men, including the robbery victim. Id. McCracken, who was losing, became angry at some point during the game and the other men left the game and returned to the club, leaving McCracken alone outside with the robbery victim. Id. At that point, the petitioner came out of the club and "wandered around the parking lot near the dice game." Id. Our direct appeal opinion summarizes what next ensued:

> Mr. McCracken ordered the [petitioner] to go get the car. At this point, Mr. McCracken and [the robbery victim] were alone at the side of the club. Mr. McCracken then pulled out a gun and pointed it at [the robbery victim]. He told [the robbery victim] to give up his money. He then fired a shot in the air. [The robbery victim] threw down what he had in his hands, including his winnings. Mr. McCracken told him to give him the rest of his money. [The robbery victim] had $1200-$1300 in his pocket to pay his rent and car note for the month. When [the robbery victim] refused, Mr. McCracken shot between his feet. [The robbery victim] then threw down the rest of his money. The [petitioner] had arrived with the car about this time. While holding the gun on [the robbery victim], Mr. McCracken ordered the [petitioner] to get out of the car and pick up the money. The [petitioner] did as he was told and returned to the car. Mr. McCracken jumped in the car, and the two men drove off.

Id.

The robbery victim gave chase, calling 911 and following the men at speeds of up to 90 miles per hour as he kept the 911 dispatcher informed of their current location. Id. Officer John Robinson, who was soon joined by Officer Robert Wilkie in a separate patrol vehicle, eventually caught up with the chase. Although the petitioner and McCracken slowed to fifty or sixty miles per hour, they did not stop their vehicle, despite the fact that both officers had their lights and sirens activated. Id. Two other officers, who were in a two-man patrol vehicle, joined the chase after hearing over the radio that the men had pointed a gun at Officer Robinson. The chase then continued until the crash occurred that cost Officer Robinson his life:

> While the [petitioner and McCracken] were in the left-hand lane, Officer Robinson attempted to pass them in the right-hand lane. Officer Wilkie remained behind the [men] and Officers Royal and Chevalier were

behind Officer Robinson. When Officer Robinson was almost past the [petitioner's and McCracken's] car, they suddenly swerved to the right and hit the left rear of Officer Robinson's car with the right front of their car. The [petitioner's and McCracken's] car hit the guardrail twice before coming to a stop. Officer Robinson's patrol car started going sideways and spun out of control. The car went off of the road and hit two or three trees before it came to rest. When the officers reached Officer Robinson's car, he was pinned in the car, gasping for breath, with his eyes wide open and unresponsive. He was taken to the hospital where he died. The [petitioner] and [McCracken] were arrested at the scene.

Id. at *1-2.

On July 26, 2004, the petitioner filed a petition for post-conviction relief in which he raised a number of claims, including ineffective assistance of counsel. Following the appointment of post-conviction counsel, the petitioner filed an amended petition in which he again raised a claim of ineffective assistance of counsel. Although he alleged numerous instances of ineffective assistance in his petition, he confines himself on appeal to arguing that counsel was ineffective for failing to clearly inform him of the adverse consequences of not testifying in his own defense.

At the evidentiary hearing, the petitioner testified that trial counsel discussed using a duress defense and told him that he would need to testify for the defense to succeed. He said he initially agreed to do so, but after hearing the State's proof he changed his mind. The petitioner explained that because none of the State's witnesses testified that he had anything to do with the robbery, he assumed that he did not need to testify. Therefore, when trial counsel asked him during the trial if he wanted to take the stand, he told him no. Trial counsel did not discuss with him the ramifications of his decision not to testify. Counsel also failed to explain the law of felony murder to him and how he could be found guilty even if his participation in the underlying felony was slight. According to the petitioner, counsel's failure to explain the concept of felony murder had an impact on his decision not to testify. He believed that decision, in turn, had an impact on the jury's verdict, which "might have been . . . a little different than what it was" had he taken the stand. He acknowledged, however, that it was difficult to say exactly what kind of effect his decision not to testify had on his case, testifying that "it could have [gone] either way."

On cross-examination, the petitioner acknowledged that trial counsel voir dired him before trial about his decision to testify. He further acknowledged that he affirmed to the trial court at that time that he understood that his decision to testify had an impact on what kind of opening statement counsel made and the type of defense strategy counsel employed.

Trial counsel testified that his defense, which he discussed at length with the petitioner, focused on showing that the petitioner had acted under duress. He and the petitioner had a good relationship and communicated well, and the petitioner understood from the beginning that he would have to testify at trial to support their defense. Trial counsel testified that he prepared the petitioner for his testimony in the days and weeks preceding trial by bringing in other lawyers to cross-examine him. He believed the petitioner, who was employed and, in contrast to McCracken, had a minimal criminal history, would make a good witness and expected him to testify at trial. He was, therefore, shocked when the petitioner told him after the State's proof that he was not going to testify.

Trial counsel testified that in hindsight he would have leaned more heavily on the petitioner when he changed his mind about testifying, "forcefully explain[ing] to [him] that he needed to get on the witness stand." He acknowledged on cross-examination, however, that whether or not to testify was ultimately the petitioner's decision alone. In addition, he testified that both he and his investigator "urged" the petitioner to testify during a conversation in the conference room prior to the second voir dire. He further acknowledged that the State's proof included testimony by an officer that he saw the petitioner, who was driving, swerve his vehicle into Officer Robinson's patrol car during the chase. Trial counsel conceded, therefore, that the State's case against the petitioner was strong. As such, he could not say whether the jury would have reached a different verdict had the petitioner testified at trial.

On July 22, 2010, the post-conviction court entered a detailed written order denying the petition for post-conviction relief. Among other things, the court found that the petitioner had failed to meet his burden of showing that counsel was deficient in his representation for not being more forceful in his attempts to persuade the petitioner to take the stand, or that he was prejudiced as a result.

## ANALYSIS

The petitioner argues on appeal, as he did before the post-conviction court, that trial counsel was deficient for failing to impress upon him the absolute necessity that he take the stand in order to support their defense theory of duress. He asserts that, had counsel been clearer about the necessity of his testimony, there is a reasonable probability that he would have testified, that the trial court would have instructed the jury on the defense of duress, and that the jury would have acquitted him of the crimes based on that defense.

The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f) (2010). When an evidentiary

hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed *de novo*, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). The reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). The prejudice prong of the test is satisfied by showing a reasonable probability, *i.e.*, a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

Because both prongs of the test must be satisfied, a failure to show either deficient performance or resulting prejudice results in a failure to establish the claim. See Henley, 960 S.W.2d at 580. For this reason, courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

In denying relief on the basis of this claim, the post-conviction court noted that the petitioner was informed during the pretrial voir dire that counsel was going to tell the jury in his opening statement that the petitioner would take the stand in his own defense. The court further noted that the petitioner was reminded that the jury expected him to testify in the voir dire following the State's proof and yet chose not to take the stand, as was ultimately his right. The court, therefore, concluded that the petitioner failed to demonstrate that trial counsel was deficient in his advice or that his failure to more clearly advise the petitioner of the necessity to take the stand prejudiced the petitioner's case.

The record fully supports the findings and conclusions of the post-conviction court. Trial counsel testified that the petitioner, with whom he had a good rapport, understood from the beginning the necessity of his testimony to support their defense theory of duress. Trial counsel also testified that both he and his investigator urged the petitioner to testify in a meeting that took place before the second voir dire. In addition, the trial transcript reveals that the petitioner affirmed during the pretrial voir dire that he understood that counsel's opening statement and approach to the case depended on his decision to testify:

> THE COURT: Step down. Return to your seat. Stand right there, [petitioner]. You understand that your indication just now that you do want to testify will have an effect on how your lawyer, [trial counsel], approaches the case and handles his opening statement.
>
> [PETITIONER]: Yes.
>
> THE COURT: And correct me if I'm wrong, [trial counsel], if I misstate anything, but . . . the record should be clear so in the event he's convicted, he doesn't say, "Wait a minute, wait a minute, he mentioned this in opening statement. I never authorized or wanted him to say this in opening statement." But I assume that you all have discussed that and that the reason you took the stand just now, at the beginning of the state's case before they put on any proof to get this on the record, is, as [trial counsel] indicated earlier this morning, so that he'll know how to approach the opening statement. You

-6-

understand all that?

[PETITIONER]: Yes, sir.

THE COURT: So, I don't know what he's going to say in opening statement, but he may well mention the fact that he . . . anticipates your testifying.

[PETITIONER]: Yes.

The petitioner was, therefore, warned that his decision to testify would affect the opening statement and counsel's theory of defense. Although counsel, in hindsight, wished he had been more forceful in his urging, he also testified that he discussed the defense theory with the petitioner, made him aware that he needed to testify in order to show that he acted under duress, and prepared him extensively for trial by having him undergo practice sessions with other lawyers. He further testified that when the petitioner changed his mind mid-trial, both he and his investigator urged him to reconsider. The petitioner has simply not met his burden of showing any deficiency in counsel's representation based on the advice he gave about testifying. As both trial counsel and the post-conviction court observed, the decision not to testify was ultimately the petitioner's alone. Had trial counsel told the petitioner that he must testify, and the petitioner been convicted, the petitioner would no doubt now be complaining that counsel left him with the impression that he had no choice in the matter.

Moreover, given the strong evidence against him, the petitioner also cannot show a reasonable probability that the outcome of the case would have been different had trial counsel succeeded in persuading him to testify. We conclude, therefore, that the petitioner has not met his burden of showing either a deficiency in counsel's representation or resulting prejudice to his case.

## CONCLUSION

Based on our review, we conclude that the petitioner has not met his burden of demonstrating that he was denied the effective assistance of trial counsel. Accordingly, we affirm the post-conviction court's denial of the petition.

_____
ALAN E. GLENN, JUDGE